Filed 4/29/25  P. v. Rivas CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B330923 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA014016) |
| v. | |
| DAVID IGNACIO RIVAS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Roberto Longoria, Judge.  Affirmed.

Elizabeth Richardson-Royer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

David Ignacio Rivas appeals from the superior court's denial of his petition for resentencing pursuant to Penal Code section 1172.6.[1]  The superior court conducted an evidentiary hearing and determined the People proved beyond a reasonable doubt he was a major participant in the underlying felony and acted with reckless indifference to human life.  We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

On January 11, 1993, Anthony Noriega was killed by a single shotgun blast to the head in Diana Esperon's living room. Noriega was driven to Esperon's home by Elisio Reynoso.  At the time of the shooting, Esperon was home with her daughter, her roommate John Gonzalez, and her friend Kathleen Kong.  Adrian Garibay, Jason Montoya, and Rivas were charged with Noriega's murder, robbery, attempted murder of Reynoso, and attempted robbery.

A.  *Trial Proceedings*

In 1995, Garibay, Montoya, and Rivas were tried together. The People's theory at trial was that Esperon asked the three defendants to help her rob Noriega in a false drug deal.  Esperon did not testify at trial or at the preliminary hearing.

---

[1]     All further references are to the Penal Code unless otherwise specified.

1.  *Reynoso's Testimony*

Reynoso testified Noriega asked him for a ride on January 11, 1993. They met at a restaurant, and Reynoso drove Noriega to Esperon's home in Monterey Park. When they arrived, Noriega told Reynoso to park several houses away. Noriega went into the house and returned a few minutes later. Reynoso then drove him to a convenience store, where Noriega played video games for 30 to 45 minutes. They also stopped at a McDonald's so Noriega could use the restroom. When they returned to Esperon's home, Reynoso again parked a few houses away. While they waited in the car for Esperon's call, they observed a black jeep drive by and return, at which point a woman got out of the car. Noriega entered the home shortly thereafter. He left his cell phone in the car. Reynoso saw a man, whom he later identified as Garibay, walk out of the house and approach the black jeep. Garibay then walked back into the house with a man. Reynoso described Garibay and the man as gang members. Reynoso called Noriega about the two men heading to the house but Noriega assured him, "Oh, it is okay, I know them."

A few minutes later, Garibay approached Reynoso in his car and insisted Noriega wanted to speak with Reynoso inside. Reynoso was reluctant but complied when Noriega did not answer his calls. As they entered, Garibay put a .45 semiautomatic gun to Reynoso's head and demanded to know where the money was. When they walked through the house, Reynoso saw Noriega lying face down on the ground with a man standing over him holding a shotgun to his head. At trial, Reynoso identified Rivas as the man standing over Noriega.

When Garibay again demanded to know where the money was, Reynoso told him, "It is in the trash." Rivas instructed Garibay to take Reynoso outside to retrieve the money. Noriega warned Reynoso, "Don't do anything stupid." Rivas said, "Don't do anything stupid or I will kill your friend."

Once outside, Garibay demanded Reynoso's car keys and said, "Don't do anything stupid or I will shoot you on the street." Garibay put the gun in his waistband. Reynoso pretended to look in the trash but when he saw that Garibay was not holding the gun, he ran and hid in bushes around the corner. Garibay fired four or five shots after him.

Because his car was found at the scene of the shooting, Monterey Park police officers visited Reynoso at his home to interview him. Reynoso initially told the officers he lent Noriega his car and knew nothing about the shooting. When the officers suggested he may have somehow been involved in the shooting and what they suspected was a drug deal, Reynoso relayed to them the events he testified to at trial.

On January 12, 1993, the day after the shooting, Reynoso identified Garibay, by photograph, as the man who took him outside. Although he was also shown a photograph of Montoya, Reynoso did not recognize him and stated the man who held the shotgun was "much thinner."

2. *Gonzalez's Testimony*

John Gonzalez rented a room in Esperon's house and witnessed the events that night. Gonzalez's preliminary hearing testimony was read into the record at trial because he asserted his Fifth Amendment right not to testify and was found to be unavailable. At the preliminary hearing, Gonzalez testified he

4

observed Noriega, Esperon, and the three defendants watching television together on January 11. That evening, he went into his bedroom, loaded his shotgun, and put it under his mattress before going to take a shower. He testified he did this every night for protection. When he returned to his room, Gonzalez heard Montoya and Garibay demanding money from Noriega. When Gonzalez looked out of the partially closed bedroom door, he saw Garibay holding a shotgun. He also saw Montoya but no one else. Gonzalez checked for his own shotgun and realized it was gone.[2]

When Gonzalez looked out of his bedroom door again, he saw Montoya holding the shotgun. Montoya and Garibay continued to demand money from Noriega. Gonzalez then heard Reynoso knocking on the side door or front door. When Reynoso came in, Noriega asked him to "please give these people the money." Gonzalez heard Reynoso exit the house with Garibay. Gonzalez testified it was Montoya, not Rivas, who stood over Noriega with the shotgun.

Gonzalez then heard four rounds fired outside of the house, consistent with Reynoso's account. Soon thereafter, he heard a shotgun blast inside the house. Gonzalez saw Garibay, Montoya, and Rivas run toward his bedroom and ask Esperon to drive them away. Montoya dropped the shotgun as they left the house. Gonzalez called 911. He confirmed it was his shotgun that was used against Noriega, and forensics confirmed Gonzalez did not have gunshot residue on his hands. Monterey Park police arrived at approximately 10:00 p.m.

---

[2] During the trial, Gonzalez informed the lead detective he lied about his shotgun being taken without his knowledge. He told the detective Garibay took it from him at gunpoint.

Gonzalez initially told the police he was asleep at the time of the shooting and did not identify any of the defendants. He later changed his account to what he relayed in his preliminary hearing testimony.

### 3. *Rivas's Defense*

Rivas did not testify at trial. He argued in his defense there was reasonable doubt about his culpability because Reynoso's statements to the police were inconsistent with his trial testimony and because Gonzalez testified he saw Montoya, and not Rivas, holding the shotgun that killed Noriega. Rivas argued he was not present at the incident in Esperon's home because he was at his aunt's birthday party at the time of the shooting. His aunt, Virginia Cervantes, and her granddaughter testified at trial that Rivas was at the party.

### 4. *The Verdict and Sentence*

The jury found Rivas guilty of first degree murder (§ 187, subd. (a)) as charged in count 1; the lesser included offense of attempted first degree residential robbery (§§ 211, 664) to the charge of first degree residential robbery in count 2; and the lesser included offense of assault with a firearm (§ 245, subd. (a)(2)) to the charge of attempted murder in count 3. The jury also found true that a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(1), as to counts 1 and 3; and that Rivas personally used a shotgun within the meaning of section 12022.5, subdivision (a), as to count 2.

The trial court sentenced Rivas to state prison for 30 years to life. Rivas appealed from the judgment and this Court affirmed.

6

B.    *Resentencing Proceedings*

On March 1, 2019, Rivas filed a petition for resentencing pursuant to former section 1170.95, current section 1172.6.  After appointing counsel and considering the parties' briefs, the superior court issued an order to show cause.  Codefendants Montoya and Garibay also filed section 1172.6 petitions and the petitions were heard together.  On September 13, 2022, the court conducted a joint evidentiary hearing on Rivas's and Montoya's petitions.[3]  The People submitted the record of the previous trial and appeal.

1.    *Additional Evidence*

Rivas did not testify or present any evidence at the joint evidentiary hearing.

Montoya testified at the hearing and presented additional evidence pursuant to section 1172.6, subdivision (d)(3).  Montoya testified that Esperon contacted him for help in conducting a drug deal.  She did not trust the buyer Noriega and wanted Montoya there to ask Noriega to leave in the event something happened.  Esperon picked him up from his apartment and drove him to her home in Monterey Park.  Garibay, Gonzalez, and Esperon's daughter were there when Montoya arrived.  Rivas arrived approximately 45 minutes later and was told about the plan after he indicated he would stay.  Montoya and Garibay were gang members at the time.  Montoya denied Rivas was a member of their gang.

---

[3]    Garibay died during the section 1172.6 proceedings.  The superior court dismissed his petition.

7

Montoya testified Gonzalez also knew about Esperon's plan. According to Montoya, Noriega arrived but he and Esperon were unable to reach an agreement; Noriega asked Esperon to show him the drugs and she asked to be shown the money. Montoya and Rivas hid in the bedroom while Noriega and Esperon negotiated. Gonzalez joined them and showed them his shotgun. Montoya testified, "He was acting weird, messing around with it, pointing it towards the bedroom window just showing off." Noriega left about 15 minutes after he arrived but was expected to return. After waiting one and a half hours, Montoya left to attend Virginia Cervantes's birthday party.[4] Montoya testified that he refused to help when Esperon asked again later that evening, and he did not return to Esperon's home that night. He asserted he stayed at Cervantes's party until approximately midnight, and he saw Rivas at the party during that time.

Lorinza Anda, Cervantes's daughter, corroborated Montoya's testimony and confirmed she saw and spoke to Montoya at the party from approximately 8:00 p.m. to midnight. She admitted she did not testify or alert authorities to his potential alibi during the original trial even though her daughter and Cervantes testified in support of Rivas's defense.

Montoya submitted a transcript of Esperon's interview with police in which she admitted to trying to arrange a drug deal between Noriega (the buyer) and George Medina (the seller). She and Noriega negotiated the deal in her bedroom, and she called Medina to bring the drugs. Noriega left before Medina arrived.

---

[4] As stated, Cervantes provided testimony supporting Rivas's alibi defense at the 1995 trial.

8

Esperon confirmed to the detective that Montoya, Rivas, and Garibay were all at her house that day but she was unsure whether they were all there at the same time that evening. Esperon confirmed Gonzalez knew about the drug deal, and she was in a back room with Gonzalez when she heard voices in her living room and a shot. She then heard someone trying to enter or exit through her kitchen door. She went to the living room and saw someone on the floor. She got in her jeep and drove off with Garibay and Montoya but did not recall whether Rivas was in the jeep with them. She told the detective she believed Montoya killed Noriega. She believed she knew Garibay well and even though he "can be heartless," he would not kill someone in her house. On the other hand, she described Rivas as a kid who "really doesn't know what is going on."

2. *Superior Court Orders*

The superior court denied Rivas's section 1172.6 petition but granted Montoya's petition. As to Rivas, the court stated:

"The Court then finds that the People's witness, Mr. [Reynoso] who accompanied the victim Mr. Anthony Noriega in this case positively identified Mr. Rivas as not only being present at the time of the killing, but as the person who held the shotgun, pointed at the victim's head as he was on the ground.

"There is very substantial evidence[5] that further supports the fact that the trial testimony of witness Reynoso indicated

---

[5]     The deputy district attorney clarified with the court during its ruling that the standard of proof was beyond a reasonable doubt and not substantial evidence.

that it was David Rivas who said, 'Don't do anything stupid or I will kill your friend.'

"It goes without saying that in addition to intending to commit a robbery with a loaded weapon, the act of pointing a shotgun close to the victim's head and threatening to kill the victim to the victim's friend [if he] does not comply with the demands[,] he is clearly acting with reckless indifference to human life and supports the findings that Petitioner David Rivas was the participant of the underlying felony by virtue of his continued participation and presence at the scene. [¶] . . . [¶]

"In this court's view [this evidence] clearly demonstrates a reckless indifference to human life and supports a finding that he was a major participant in the underlying felony by virtue, again, of his continued participation and armed presence at the time.

"The court also notes that at trial Petitioner Rivas called alibi witnesses at trial claiming that he could not have been present at the crime location because he was at a family party. The jury, therefore, considered and found those witnesses either not trustworthy, unreliable, or unbelievable as reflected in their guilty verdict and charges against him.

"Therefore, for all the aforementioned reasons the court is going to deny the petitioner's request for resentencing and find he's ineligible for relief as to Mr. Rivas."

As to Montoya, the court noted the contradictory testimony provided by Reynoso (who testified Rivas held the shotgun over Noriega), and Gonzales (who testified he saw Montoya hold the shotgun just before he heard the blast). The court determined Reynoso was more credible than Gonzalez, since Reynoso consistently told officers at the photo show up, in the live lineup,

and at trial that Montoya was not the person holding the shotgun. By contrast, Gonzalez's "testimony regarding what happened was not only inconsistent depending on who interviewed him, his actions and motives were certainly highly suspect." The court expressed that it "would abandon its responsibilities of making an independent evaluation[] of the evidence" if it simply accepted the People's argument Gonzalez's testimony was trustworthy or reliable.

Rivas timely appealed.

## DISCUSSION

Rivas first asserts the superior court improperly considered itself bound by the jury's findings thus abdicating its role as an independent fact finder. Rivas next argues the evidence was insufficient to prove his guilt beyond a reasonable doubt because Reynoso's eyewitness identification was "deeply flawed." Lastly, Rivas contends the trial court improperly failed to consider Rivas's youth—he had just turned 18 at the time of the shooting—when it determined he acted with reckless indifference to human life.

A.     *Section 1172.6 and Standard of Review*

Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and significantly limited the scope of the felony murder rule by amending sections 188 and 189. (See *People v. Reyes* (2023) 14 Cal.5th 981, 984 (*Reyes*); *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*); *People v. Lewis* (2021) 11 Cal.5th 952, 957

11

(*Lewis*).)  Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony murder rule in section 189, subdivision (e).  Section 189 now requires the People to prove the defendant was the actual killer (§ 189, subd. (e)(1)); an aider and abettor to murder who had the intent to kill (§ 189, subd. (e)(2)); or a major participant in an underlying felony listed in section 189, subdivision (a), who acted with reckless indifference to human life as described in subdivision (d) of section 190.2 (§ 189, subd. (e)(3)).  (See *People v. Curiel* (2023) 15 Cal.5th 433, 448 (*Curiel*); *People v. Wilson* (2023) 14 Cal.5th 839, 868-869.)

Senate Bill No. 1437 also provided a procedure in section 1172.6 for an individual convicted of felony murder or murder under the natural and probable consequences theory to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if the individual could not have been convicted of murder under the changes to sections 188 and 189.  (See *Lewis, supra*, 11 Cal.5th at p. 959.)

Where, as here, the petitioner makes the requisite prima facie showing he is entitled to relief under section 1172.6, the superior court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and resentence the petitioner on any remaining counts.  (See § 1172.6, subds. (c), (d)(1).)

Section 1172.6, subdivision (d)(3), provides that at the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189

12

made effective January 1, 2019.  The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. . . .  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3).)

"Of course, in a section [1172.6] petition, the trial judge [is not] charged with holding a whole new trial on all the elements of murder.  Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder."  (*People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*); accord, *People v. Vargas* (2022) 84 Cal.App.5th 943, 952 (*Vargas*); see *People v. Daniel* (2020) 57 Cal.App.5th 666, 678 (*Daniel*) [rejecting argument that section 1172.6 "authorizes a defendant to present new evidence to undermine a jury's finding of guilt under a particular theory of murder, effectively retrying the case"].)

We review the superior court's decision to deny the petition after an evidentiary hearing for substantial evidence, provided the court understood the elements of the offense and applied the proper standard and burden of proof.  (See *Reyes, supra*, 14 Cal.5th at p. 988; *Vargas, supra*, 84 Cal.App.5th at p. 951.)

B.      *The Superior Court Made Independent Factual Findings*

Rivas first contends the court failed to act as an independent fact finder because it erroneously believed it was bound by the jury's personal use true finding and by its rejection of Rivas's alibi defense.  According to Rivas, the jury's findings

13

did not have preclusive effect under collateral estoppel principles because new evidence was presented at the evidentiary hearing. The new evidence consisted of Montoya's testimony that he saw Rivas at the birthday party, and the newly admitted transcript of Esperon's statement to the police that she did not recall Rivas being in the car when she drove Montoya and Garibay away after the shooting.

The superior court acts as an independent fact finder at a section 1172.6 evidentiary hearing. (See *Gomez v. Superior Court* (2024) 100 Cal.App.5th 778, 787.) Its factual determinations are limited to "issues made relevant by the changes to the law effected by Senate Bill No. 1437." (*Ibid.*; accord, *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 458.) As stated, "in a section [1172.6] petition, the trial judge [is not] charged with holding a whole new trial on all the elements of murder. Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder." (*Clements, supra,* 75 Cal.App.5th at p. 298; see *Curiel, supra,* 15 Cal.5th at p. 470 [section 1172.6 does not permit "'litigat[ing] anew' any trial issues or allowing 'a petitioner to challenge any aspect of the factfinding from the original trial that [they] wish[] to revisit.'"]; *People v. Williams* (2020) 57 Cal.App.5th 652, 661 [same].)

Here, the record shows the superior court independently considered the evidence presented at the evidentiary hearing and applied the proper standard of proof.[6] Gonzalez and Reynoso provided contradictory testimony about who held the shotgun

_____

[6] As stated, although the court misspoke by stating there was "very substantial evidence" supporting its findings, the deputy district attorney immediately interjected to ensure the court applied the beyond a reasonable doubt standard of proof.

14

aimed at Noriega. In its ruling, the superior court addressed Gonzalez's and Reynoso's testimony at length, citing to the record by page and line number and noting any inconsistencies. It found Reynoso was the more credible witness. The court credited Reynoso's testimony that Rivas held the shotgun to Noriega's head and threatened to kill Noriega. It discounted Gonzalez's testimony that he observed Montoya holding the shotgun just before he heard the shot.

The superior court's detailed examination of the evidence demonstrates it did not simply "defer" to the jury's true finding as to (1) the personal use enhancement and (2) the jury's implicit rejection of the alibi defense. First, its differing orders on Montoya's and Rivas's petitions demonstrate the court did not consider itself bound by the jury's personal use finding in light of the evidence presented at the evidentiary hearing. Indeed, the jury found true the same section 12022.5, subdivision (a), personal use enhancement as to both Montoya and Rivas in connection with the attempted robbery conviction. If the court believed it was bound by the jury's personal use findings, it would not have granted Montoya's petition and denied that of Rivas. Second, the record before us demonstrates the superior court did take into account the jury's rejection of Rivas's alibi defense when the court noted the alibi witness testimony in its ruling, but it did not treat the jury's finding as conclusive and made its own conclusion.

The California Supreme Court has "rejected the argument that section 1172.6 categorically prohibited the consideration of factual findings made by a jury in the defendant's underlying trial." (*Curiel, supra,* 15 Cal.5th at p. 451, discussing *Strong, supra,* 13 Cal.5th at p. 715.) As *Strong* explained, section 1172.6

15

"strongly suggests" the Legislature intended superior courts to examine "many, and perhaps most" prior jury findings on resentencing, whether adverse or favorable to a defendant. (*Strong,* at p. 715.) The Legislature did not intend "to permit wholesale relitigation of findings supporting murder convictions" in resentencing proceedings. (*Ibid.*; *People v. Coley* (2022) 77 Cal.App.5th 539, 549 ["a section [1172.6] petition is not a means by which a [petitioner] can relitigate issues already decided"].) As a result, "general principles of issue preclusion informed [the high court's] consideration of the effect of prior jury findings in a resentencing proceeding under section 1172.6." (*Curiel,* at p. 451.)

Rivas contends issue preclusion does not apply to the jury's rejection of his alibi defense in this case because additional evidence was admitted at the evidentiary hearing. Rivas cites cases suggesting a superior court may make a factual finding at odds with those of the jury when the parties present new evidence concerning that issue at the evidentiary hearing. (See, e.g., *People v. Arnold* (2023) 93 Cal.App.5th 376; *People v. Henley* (2022) 85 Cal.App.5th 1003; *People v. Cooper* (2022) 77 Cal.App.5th 393.)

We need not decide whether the jury's rejection of Rivas's alibi defense has preclusive effect here. Although the superior court noted the jury's guilty verdict necessarily meant the jury rejected the testimony of the alibi witnesses, the court did not state it was bound by the jury's implicit finding. It made its own credibility determination: it believed Reynoso's testimony placing Rivas at the scene of the crime. And, as stated, the Supreme Court has rejected the argument that a superior court is categorically prohibited from considering a jury's prior factual

16

findings. (See *Curiel, supra,* 15 Cal.5th at p. 451, discussing *Strong, supra*, 13 Cal.5th at p. 715.) Further, the alibi finding was not relevant to the issues at Rivas's resentencing hearing, because the purpose of that hearing was not to relitigate whether Rivas was involved in the crime but rather to consider the extent of his involvement. (See *Daniel*, *supra,* 57 Cal.App.5th at p. 678 [section 1172.6 does not allow defendant to present new evidence to undermine jury's finding of guilt, effectively retrying the case]); accord, *Curiel, supra,* 15 Cal.5th at p. 470.)

C.      *Substantial Evidence Supports the Superior Court's Finding Rivas Was a Major Participant and Acted with Reckless Indifference to Human Life*

1.      *Applicable Law and Standard of Review*

Under amended section 189, subdivision (e)(3), a person who participates in one of the felonies listed in section 189, subdivision (a), may be liable for murder if the People prove he or she "'was a major participant in the underlying felony and acted with reckless indifference to human life,'" within the meaning of section 190.2, subdivision (d). (*Curiel, supra*, 15 Cal.5th at p. 448; see *Strong, supra*, 13 Cal.5th at p. 708.) *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) "substantially clarified the law surrounding major participant findings," and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) "substantially clarified the relevant considerations for determining whether a defendant has acted with reckless indifference to human life." (*Strong, supra*, 13 Cal.5th at p. 721.)

*Banks* specified that courts should consider: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in

17

supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.)

In *Clark*, the high court analyzed the subjective and objective elements to determine whether a defendant acts with reckless indifference to human life, including:  was the defendant aware that weapons would be used; did the defendant himself or herself use the weapon; did the defendant have an opportunity to reduce the overall risk of violence during the felony or to aid the victim; and did the defendant know his cohorts were likely to use lethal force.  (See *Clark, supra*, 63 Cal.4th at pp. 618-622.)  The high court observed these elements largely overlap with the "major participant" analysis.  (*In re Scoggins* (2020) 9 Cal.5th 667, 676-677.)  "'Although we state these two requirements separately, they often overlap,'" "'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark*, at p. 615.)

"While the superior court acts as an independent fact finder in determining whether the People have met their burden, on appeal, the reviewing court applies the substantial evidence standard to the superior court's findings." (*Vargas, supra,* 84 Cal.App.5th at p. 951; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590-591 (*Mitchell*).)

"In reviewing the trial court's findings for substantial evidence, we apply well-settled principles.  'We "'examine the

entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.'" [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.'" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480 (*Oliver*).)

     2.    *Analysis*

As stated, after examining the evidence before it, the superior court credited Reynoso's identification of Rivas as the individual standing over Noriega with the shotgun and threatening to kill Noriega if Reynoso did "anything stupid." Under *Clark* and *Banks,* this conduct was sufficient to satisfy the major participant and reckless indifference to human life components of the current felony-murder law: Rivas was present at the scene of the robbery; he was armed with a shotgun; he held the shotgun pointed at Noriega; he threatened Noriega's life; he fled after the shooting; and he did not aid Noriega or Reynoso, the victims. (See *Banks, supra*, 61 Cal.4th at p. 803; *Clark, supra*, 63 Cal.4th at pp. 615, 618-622.) This is substantial evidence supporting the superior court's finding that Rivas was a major participant in the underlying felony who acted with reckless indifference to human life.

19

Rivas argues Reynoso's identification of him was "deeply flawed" because, in his view, Reynoso could not have seen Rivas clearly from his vantage point, the house was dark, and Reynoso was in the house for "mere seconds." Additionally, Rivas contends the photo show up procedure was "highly suggestive," and Reynoso's story lacked credibility due to inconsistencies and Reynoso's previous falsehoods to detectives. Rivas asserts his alibi witnesses were more credible than Reynoso. Rivas argues, "[a]t a minimum, the conflicting accounts given by Gonzalez and Reynoso, plus Rivas's alibi evidence, meant that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt."

Rivas's insufficiency of the evidence arguments address the reliability and credibility of Reynoso's testimony vis-à-vis Gonzalez's and the alibi witnesses' testimony. The superior court found Reynoso's testimony was reliable and credible. On appeal, we may not substitute our own credibility determinations for those of the superior court. (See *People v. Nelson* (2011) 51 Cal.4th 198, 210 ["'We do not reweigh evidence or reevaluate a witness's credibility'"]; *Oliver, supra,* 90 Cal.App.5th at p. 480.)

Further, to the extent Rivas argues that under section 1172.6 his actual innocence can be relitigated, the law does not support the argument. "A defendant cannot use a section 1172.6 resentencing hearing to relitigate facts already determined, whether by plea, admission, or verdict." (*People v. Hill* (2025) 109 Cal.App.5th 274, 288; accord, *People v. Farfan* (2021) 71 Cal.App.5th 942, 947 ["'The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.'"];

20

see *Strong, supra,* 13 Cal.5th at p. 715; *Curiel, supra,* 15 Cal.5th at p. 470.)

D.    *Youth as a Factor in Rivas's Mental State*

Rivas further contends the superior court failed to consider his youth as a factor relevant to whether he acted with reckless indifference to human life.  Rivas asserts he had just turned 18 at the time of the offense.  Rivas did not raise this argument in the superior court and it is forfeited.  (See *People v. Pittman* (2023) 96 Cal.App.5th 400, 416.)  Further, Rivas does not cite anything in the record before us that would support his contention.  (See *People v. Dougherty* (1982) 138 Cal.App.3d 278, 282-283 [failure to cite record forfeits issue on appeal].)  Rivas fails to provide any facts and record citations that would support his argument that his youth affected whether he harbored the requisite mental state for felony murder.[7]  (See *Pittman,* at p. 418 ["The cases discussing the role of youth in relation to criminal culpability 'stress two areas': youthful offenders' 'relative impulsivity' and 'their vulnerability to peer pressure.'"]; *ibid.* [concluding the ""'hallmark features of youth'" may have been at play" given specific circumstances of the crime]; but see  *Mitchell, supra,* 81 Cal.App.5th at p. 595 ["Youth can distort risk calculations.  Yet every 18 year old understands bullet wounds require attention.  The fact of youth cannot overwhelm all other factors."].)  "[O]ur review is limited to those issues that have been adequately raised and supported in the appellant's brief" and "it

---

[7]    Rivas asserts that any forfeiture is a result of the ineffective assistance of counsel he received during the trial proceedings.  Rivas states he intends to file a petition for habeas corpus addressing trial counsel's ineffectiveness.

is not the appellate court's role to construct theories or arguments" for an appellant.  (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721; Cal. Rules of Court, rule 8.204(a)(1)(B) [appellate brief must "support each point by argument and, if possible, by citation of authority"], and rule 8.360(a) [briefs in criminal appeals must comply with rule 8.204].)

## DISPOSITION

The order denying Rivas's petition for resentencing pursuant to section 1172.6 is affirmed.

MARTINEZ, P. J.

We concur:

SEGAL, J.

STONE, J.